# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:  Case No. F08-00110-DMD | Chapter 11 |
| CATHOLIC BISHOP OF NORTHERN ALASKA, | |
| Debtor. | |

<div style="border:1px solid">

**Filed On**

**9/11/09**

</div>

| | |
|---|---|
| CONTINENTAL INSURANCE COMPANY, | Adversary No. F08-90033-DMD |
| Plaintiff, | |
| v. | |
| CATHOLIC BISHOP OF NORTHERN ALASKA, | |
| Defendant. | |

## MEMORANDUM ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This memorandum decides cross summary judgment motions.  The major issue presented in both motions is whether the existence of missing liability insurance policies has been established by secondary evidence.  The Catholic Bishop of Northern Alaska ("CBNA") moved for summary judgment to establish the existence of lost or missing liability insurance policies it contends were issued by Continental Insurance Company ("CIC") for periods in the 1970's.[1]  CBNA seeks to establish this insurance coverage because of recent claims which have been asserted against it for sexual abuse committed by church personnel who

---

[1] CBNA's Mot. for Summ. J., filed Oct. 1, 2007 (Docket No. 47) and Mem. in Supp., filed October 1, 2007 (Docket No. 48).

worked for CBNA during the 1970's. CBNA has not been able to locate the originals or copies of the insurance policies it says were issued by CIC. It has provided secondary evidence which it contends shows that CIC provided it with liability coverage for periods in the 1970's on terms identical to those in contemporaneous liability insurance policies which have been located for CBNA's sister diocese in Anchorage.

CIC's cross-motion for summary judgment seeks a declaration that it has no duty to defend or indemnify CBNA because the existence and terms of the lost or missing policies cannot be established by sufficient, admissible secondary evidence.[2]

Giving CBNA the benefit of all *reasonable* inferences, I conclude it has not produced sufficient evidence of the existence, terms and conditions of liability coverage to carry its burden of persuasion. The testimony and documentary evidence provided by CBNA fails to establish directly or create a reasonable inference that CIC ever issued liability insurance which would cover the abuse claims. Accordingly, CBNA's motion for summary judgment will be denied, and CIC's cross-motion will be granted.

Factual and Procedural Background

Starting in 2003, a number of individuals filed suit against CBNA alleging claims of sexual abuse by clergy or church volunteers who worked for CBNA. Several of these abuse claims arose during the period from October 14, 1973, to April 15, 1979. CBNA tendered defense of these claims to CIC, based on its belief that CIC had issued it liability insurance coverage for this period. However, CBNA could not locate any of the original

---

[2] CIC's Mot. for Summ. J., filed Oct. 1, 2007 (Docket No. 45) and Mem. in Supp., filed Oct. 1, 2007 (Docket No. 46).

policies or copies of the policies it alleges provide for its defense and indemnity. CBNA's research did produce some records which led it to believe there might have been CIC liability coverage for the occurrences. When tendering its defense, CBNA provided CIC with copies of these records, which included documents referencing CIC insurance policy numbers, insurance related forms, and certain accounting information.

CIC provided for CBNA's defense in some of the abuse suits under a reservation of rights. To free itself of continued defense obligations and the possibility of indemnity for the abuse claims, on January 19, 2006, CIC filed a declaratory judgment action against CBNA in United States District Court for the District of Alaska.[3] CIC alleged CBNA could not meet its burden of proof to establish the existence of the alleged policies, or their effective dates, terms, exclusions or limits. CIC requested a declaration that it had no duty to defend or indemnify CBNA with respect to the abuse claims.

CBNA unsuccessfully moved to dismiss CIC's suit. The summary judgment motions which are the subject of this memorandum decision were filed in the district court case and were scheduled for oral argument in that court on April 10, 2008. This hearing date was vacated by the district court after CBNA filed for chapter 11 relief on March 1, 2008. CIC obtained relief from stay from the bankruptcy court for the limited purpose of permitting the district court to hear oral argument and render a decision on the cross-motions.[4] However, the district court ultimately referred CIC's declaratory judgment action to this

---

[3] Case No. 3:06-cv-00019-TMB.

[4] Order Granting Limited Relief From Stay, filed Jun. 27, 2008 [Docket No. 222], in *In re Catholic Bishop of N. Alaska*, Case No. F08-00110-DMD.

bankruptcy court, finding that this court had jurisdiction to determine the dispute.[5]  This court

heard oral argument on the cross-motions for summary judgment on June 30, 2009.

CBNA's summary judgment motion asks the court to find that the Diocese had

liability coverage for the applicable period, October 14, 1973, to April 15, 1979, identical to

the coverage CIC provided in substantially contemporaneous policies insuring the

Archdiocese of Anchorage.  The policies for the Archdiocese of Anchorage physically exist,

and CBNA contends that its insurance mirrored the insurance purchased by this sister diocese

during the 1970's.  The policies issued to the Archdiocese of Anchorage included a duty to

defend, and had the following limits for bodily injury liability:

–    $100,000 for each person
–    $300,000 for each occurrence
–    $300,000 aggregate.[6]

CBNA has identified several CIC policy numbers which it says point to the

existence of such policies.  They are policy numbers SMP 2390621 for the earlier period

from 1973 to 1975, and SMP 2397996 covering the latter period of 1975 to 1978.  The

designation "SMP" stands for "special multiperil policy."[7]

Three key depositions in this case are relied upon by CBNA to support its

summary judgment motion.  These depositions are also relied upon by CIC to refute CBNA's

analysis.  These are:

---

[5] Order, entered Aug. 14, 2008 [Docket No. 77], in *Continental Ins. Co. v. Catholic Bishop of N. Alaska*, USDC Case No. 3:06-cv-00019-TMB; *also entered* as Docket No. 1 in the instant action.

[6] CBNA's Mem. in Supp. of Mot. for Summ. J. (Docket No. 48), 10 n.31.

[7] Robb Dep. 21:11-13, appended to CBNA's Mot. for Summ. J. (Docket No. 47).

–    the deposition of Juanita Brown, an employee of LaBow Haynes, the insurance broker at the time for the Fairbanks Diocese, as well as the Archdiocese of Anchorage and the Juneau Diocese;

–    the deposition of Julian Robb, a CIC underwriter at the time; and

–    the deposition of George Bowder, a financial officer of CBNA from 1978 to the present.

There are a dozen or so pieces of documentary evidence as well. CBNA argues it has sufficiently established the existence and terms of defense and indemnity liability coverage by secondary evidence to bind CIC, despite the fact that it cannot locate the actual policies themselves.[8] CBNA contends that the terms of its policies can be inferred to be "identical" to the terms of the liability coverage CIC extended to the Archdiocese of Anchorage during the same time frame. CIC refutes these contentions. It argues that the deposition testimony is inconclusive and most of the documents are inadmissible or, if admissible, do not support a reasonable inference that liability insurance coverage actually existed.[9]

Secondary Evidence

When an insurance policy has been lost or is missing through no fault of the insured, and the insurer cannot produce copies of the policy, the insured may prove the existence of the policy and its terms through the offer of "secondary evidence." The

---

[8] CBNA's Mem. (Docket No. 48 ), 1-2.

[9] CIC's Mot. for Summ. J. (Docket No. 45), 2.

5

introduction of secondary evidence regarding a lost insurance policy is governed in a federal court by Federal Rule of Evidence 1004(1):

> Rule 1004. **Admissibility of Other Evidence of Contents**:
>
> The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if –
>
> (1) **Originals lost or destroyed**. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.][10]

There are few cases involving lost insurance policies directly on point in the Ninth Circuit and none in Alaska (which has an identical evidence rule). In one case from the District of Alaska, *Mapco Alaska Petroleum, Inc., v. Central National Insurance Company*,[11] Judge Holland applied Fed. R. Evid. 1004(1) to find that a lost insurance policy existed. He stated:

> MAPI has presented sufficient evidence to establish the existence of a third policy that was issued on September 1, 1980. Although MAPI admits it was unable to locate the original policy after a good faith search, it can produce secondary evidence of the policy's existence. *See* Rule 1004, Federal Rules of Evidence.
>
> MAPI has produced the certificate of insurance referencing the September 1980 policy and a cover letter from the insurance broker indicating that the policy was in effect. MAPI can produce invoices indicating payment of the

---

[10] Fed. R. Evid. 1004(1).

[11] 795 F.Supp. 941 (D. Alaska 1991).

6

> premiums.  The 1980 policy is referred to in other
> policies.   Finally,  there  is  no  evidence  of
> cancellation or withdrawal of the policy.[12]

Judge Holland noted that the insurance company had provided no Ninth Circuit authority to support its contention that MAPI had to prove the existence of the policy by clear and convincing evidence.  He concluded that MAPI had provided "sufficient evidence of the existence of the missing policy for the purposes of a summary judgment."[13]  The insurance company's motion for summary judgment on this issue was denied.

An Alaska case applied Alaska Evidence Rule 1004(1), which is identical to the federal rule, to determine whether a copy of a promissory note had been sufficiently authenticated to be admitted into evidence, where the original note was missing.[14]  The court held the authentication of the copy of the note need not be by clear and convincing evidence,[15] but that the clear and convincing standard of proof applied to determine the plaintiff's right to recover under the note.[16]

Courts outside Alaska have viewed secondary evidence in a variety of lost policy cases with varying results.  In *Bituminous Casualty Corporation v. Vacuum Tanks,*

---

[12] *Id.* at 948.

[13] *Id.* at 948-49; *see also* 17A *Couch on Ins.* § 254.28 (3d ed. 2009) (regarding the differing views on the applicable burden of proof).

[14] *Buster v. Gale*, 866 P.2d 837 (Alaska 1994).

[15] *Id.* at 842.

[16] *Id.* at 844-45, referring to former AS 45.03.804 [former UCC § 3-804]; *but see Rubenstein v. Royal Ins. Co. of America,* 694 N.E.2d 381, 384 (Mass. Super. 1998) (only a preponderance of evidence needed to prove the existence or content of a lost or missing insurance policy, absent a strong likelihood of fraud or wrongdoing).

*Inc.,*[17] the Fifth Circuit overturned a judgment in favor of the insured.  The court found that

the secondary evidence introduced by the insured was insufficient to establish the liability

of the insurance company under Texas law.  The court stated:

> Where the actual policy is not available, the terms
> of the contract can also be shown by secondary
> evidence.  This alternative requires evidence of
> the policy terms, not just evidence of the
> existence of the policy.  This type of secondary
> evidence is admissible under Federal Rule of
> Evidence 1004 as long as the original contract has
> not been destroyed or lost in bad faith.
>
> In this case there was no evidence of any
> bad faith on the part of VTI, and secondary
> evidence of the policy terms would have clearly
> been admissible.  However, VTI failed to
> introduce any evidence sufficient to prove the
> actual terms of the policy.  VTI did introduce the
> policy numbers, dates of coverage, and coverage
> amounts of the CGL policies.  However, Texas
> cases have held that such information is
> insufficient for the court to make coverage
> decisions absent proof of the actual policy terms.[18]

In a Delaware district court lost policies case, Remington Arms Company

successfully withstood a motion for summary judgment filed by Liberty Mutual Insurance

Company.[19]  Remington submitted over 2,000 pages of secondary evidence in support of its

claim for insurance, including:

---

[17] 975 F.2d 1130 (5th Cir. 1992).

[18] *Id.* at 1132-33 (citations and footnotes omitted).

[19] *Remington Arms Co. v. Liberty Mut. Ins. Co.,* 810 F.Supp. 1420 (D.Del. 1992).

> A plethora of Liberty Mutual documents including, in part; business records and sample insurance policies; policies from a year prior to ones in question which have been marked-up for renewal and policies for a year subsequent to ones in question which have been marked as renewals; policy jackets, internal memoranda which include direct references to the policies at issue; and retrospective premium reports which also specifically reference the policies at issue.[20]

The court found that the evidence produced by Remington was sufficient to establish a genuine issue of fact as to the existence and content of the missing policies, and denied Liberty Mutual's motion for summary judgment.

CBNA suggests, and the court agrees, that the *Dart*[21] case from California contains a good exposition of the law regarding secondary evidence in a lost insurance policy case and is a good case for this court to follow.  *Dart* involved lost insurance policies for claims involving the use of a drug, DES, in the 1970's by the mothers of claimants while they were *in utero*.  As adults, these claimants allegedly suffered from various medical conditions, including cancer, which they contended were caused by the drug.  They sued the drug manufacturer, Dart Industries (a successor of Rexall Drug Company), which tendered defense of the claims to three insurance companies.  Two of the companies settled, but Commercial Union denied coverage and refused to provide a defense.  Dart filed a declaratory judgment action against Commercial to establish the existence and terms of

---

[20] *Id.* at 1427.

[21] *Dart Indus., Inc. v. Commercial Union Ins. Co.,* 52 P.3d 79 (Cal. 2002).

insurance coverage.  As in the instant case, due to the passage of time, the original policy was lost and neither Dart nor Commercial could locate a copy.

The secondary evidence issue was decided in *Dart* under California Evidence Code § 1521, which is not an exact analog to Fed. R. Evid. 1004(1):

### § 1521.  Secondary evidence rule

(a)  The content of a writing may be proved by otherwise admissible secondary evidence. The court shall exclude secondary evidence of the content of writing if the court determines either of the following:

(1)  A genuine dispute exists concerning material terms of the writing and justice requires the exclusion.

(2)  Admission of the secondary evidence would be unfair.

(b)  Nothing in this section makes admissible oral testimony to prove the content of a writing if the testimony is inadmissible under Section 1523 (oral testimony of the content of a writing).

(c)  Nothing in this section excuses compliance with Section 1401 (authentication).

(d)    This section shall be known as the "Secondary Evidence Rule."[22]

I believe that the following holdings from *Dart* should be used as guides in this court's evaluation of the secondary evidence which has been produced here:

---

[22] Cal. Evid. Code § 1521.

(1)    "[A] bona fide and diligent search has been unsuccessfully made for [the missing policy] in the place where it was most likely to be found; and further, the party is expected to show that he has in good faith exhausted in a reasonable degree all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him."[23]

(2)    "If any suspicion hangs over the instrument, or that it is designedly withheld, a rigid inquiry should be made into the reasons for its non-production. But where there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original – in fact, courts in such cases are extremely liberal.  Questions whether the search was sufficient in scope and was conducted in good faith are addressed to the discretion of the trial court, and will not be disturbed on appeal absent abuse of discretion."[24]

(3)    "A corollary of the rule that the contents of lost documents may be proved by secondary evidence is that the law does not require the contents of such documents be proved verbatim."[25]

(4)    Many types of secondary evidence are admissible to prove a lost document, including oral testimony.[26]

---

[23] *Dart*, 52 P.3d at 85-6, *citing Folsom's Executors v. Scott*, 6 Cal. 460, 461 (Cal. 1856) (internal quotation marks removed); *see also General Survey Relating to Proving the Existence and Terms of Lost Insurance Policies*, Part A, Burden of Proof, Practicing Law Institute - Commercial Law and Practice Course Handbook, PLI Order No. A4-4146 (March 1, 1986) ("Before attempting to prove the contents of a lost instrument, the party must prove by clear and convincing evidence that it is, indeed, lost or otherwise unavailable.  He must, therefore, show he has made a 'thorough, careful and vigilant search' for the writing." [citations omitted]); 17A *Couch on Ins.* § 253:27 (3d ed. 2009) .

[24] *Id.* at 86, *citing Kenniff v. Caulfield*, 73 P. 803 (Cal. 1903) (internal quotation marks removed and citations omitted); *see also* Craig N. Johnson, *Litigating Lost or Missing Insurance Policies*, 25 Colorado Lawyer 115 (October 1996) ("Finally, although not a statutory requirement, Colorado courts have required parties seeking to admit secondary evidence of a lost or missing document to demonstrate that they have exercised due diligence in attempting to find the document before such evidence may be admitted." [footnote omitted]).

[25] *Id.* at 86; *but compare Kleenit, Inc. v. Sentry Ins. Co.*, 486 F.Supp.2d 121, 125-26 (D.Mass. 2007) ("Under Massachusetts law, the proponent of a lost insurance policy must show by a preponderance of evidence both the existence and contents of a lost or missing policy." [citation omitted]).

[26] *Dart*, 52 P.3d at 86-7; 17A *Couch on Ins.* § 253:27 (3d ed. 2009).

(5)    In a lost policy case, just as in one where the policy is available, the burden of proving that the occurrence is within the scope of the policy's coverage is on the insured.  Once that showing is made, the insurer has the burden of showing it is specifically excluded.[27]

> Thus, the claimant has the burden of proving (1) the fact that he or she was insured under the lost policy during the period in issue, and (2) the substance of each policy provision essential to the claim for relief, i.e., essential to the particular coverage that the insured claims.  Which provisions those are will vary from case to case . . . .  In turn, the insurer has the burden of proving the substance of any policy provision "essential to the . . . defense."  Those provisions, too, will be case specific.[28]

(6)    The verbatim language of the lost policy need not be proved; rather, "the proponent of the lost document need only prove the relevant substance of the document."[29]

The court in *Dart* did not discuss the applicable burden of proof, because that issue had been established as the law of the case in previous proceedings and had not been appealed.[30]

Having determined the standards by which to judge CBNA's secondary evidence, as culled from *Dart*, the next step is to establish the parties' respective burdens under the summary judgment standards set by Fed. R. Civ. P. 56.

---

[27] *Dart*, 52 P.3d at 87; *see also Sharonville v. American Employers Ins. Co.*, 846 N.E.2d 833, 838-39 (Ohio 2006) (applying Ohio law).

[28] *Dart*, 52 P.3d at 87-8 (citations omitted).

[29] *Id.* at 86, 89.

[30] *Id.* at 88 n.4.  The preponderance of evidence standard was applicable.

Summary Judgment

CBNA's and CIC's respective motions for summary judgment are both governed by Fed. R. Civ. P. 56, made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[31] "An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."[32]

The analysis of CBNA's burden to show the existence of insurance coverage is more straightforward than CIC's burden to prove the negative. CBNA's motion seeks to establish the existence of liability coverage through the use of secondary evidence. On this issue, CBNA bears the ultimate burden of persuasion at trial, and must show by its summary judgment motion there is no genuine dispute regarding the following material facts: (1) that a policy was issued by CIC, and (2) that the policy contained terms which would provide it with liability coverage for the abuse claims which have been asserted against it.

CIC's burden, on the other hand, is to establish as a matter of law that it is not bound to defend and indemnify CBNA because CBNA cannot prove it has coverage. Although CBNA has the ultimate burden of persuasion at trial, CIC, as a movant for summary judgment, has to show the court there is no justifiable reason for the case to go to trial because CBNA can not carry its ultimate burden of proof. CIC can accomplish this in

---

[31] Fed. R. Civ. P. 56(c).

[32] Fed. R. Civ. P. 56(d)(2).

13

one of two ways: (1) by showing that CBNA cannot prove an essential element of its case (e.g., CBNA cannot show that a policy ever existed); or, (2) after an ample opportunity for discovery, that CBNA does not have enough evidence to carry its ultimate burden of persuasion. I believe CIC's motion chooses the second path.

In *Nissan Fire & Marine Insurance Company, Ltd. v. Fritz Companies, Inc.*,[33] the Ninth Circuit discussed how a party such as CIC, who does not hold the ultimate burden of persuasion at trial, bears "both the initial burden of production and the ultimate burden of persuasion" when moving for summary judgment.[34] The court analyzed an apparent conflict between two Supreme Court cases which dealt with how a party without the ultimate burden of proof goes about proving that a party which did have that burden could not meet it at trial,[35] and stated:

> Under *Adickes* and *Celotex*, a moving party without the ultimate burden of persuasion at trial thus may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. The first method, at issue in *Adickes*, may be more commonly employed because it is easier in many cases to produce affirmative evidence negating an essential element of the nonmoving party's claim

---

[33] 210 F.3d 1099 (9th Cir. 2000).

[34] *Id.* at 1102.

[35] These two cases are *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

14

or defense than it is to show that the nonmoving party has insufficient evidence to carry its ultimate burden of persuasion at trial.  But this does not mean that the second method, at issue in *Celotex*, is legally disfavored.   The Supreme Court has clearly indicated that, in appropriate cases, a moving party may carry its initial burden of production by showing that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial.[36]

The court also provided a clear roadmap of what each party must do to protect its position:

> If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.   In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").   But if the nonmoving party produces

---

[36] *Nissan Fire*, 210 F.3d at 1106; *see also High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.[37]

In this case, CIC is not adopting the *Adickes* route in its summary judgment motion, i.e., it is not producing affirmative evidence negating an essential element of CBNA's case. CIC has chosen the second, *Celotex* route, and seeks to show that CBNA, having had ample opportunity for discovery, has insufficient proof to carry its ultimate burden of persuasion at trial. CIC also argues that most of the documentary evidence relied upon by CBNA to prove its case should be excluded as inadmissible.

There are a number of rules to consider when reviewing summary judgment motions. Reasonable inferences are drawn in favor of the party opposing a motion for summary judgment.[38] But such inferences may be drawn "only if they are rational, reasonable and otherwise permissible in light of the governing substantive law and substantive evidentiary burden."[39] A mere scintilla of evidence will not create a genuine issue of material fact.[40] A genuine issue of material fact is not created where the only issue of fact is which of two conflicting versions of a witness's testimony is correct.[41] Finally,

---

[37] *Nissan Fire*, 210 F.3d at 1102-03 (other citations omitted).

[38] *Ballen v. City of Redmond*, 466 F.3d 736, 741 (9th Cir. 2006).

[39] *Bathony v. Transamerica Occidental Life Ins. Co.*, 795 F.Supp. 296, 298 (D. Alaska 1992).

[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[41] *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 *(*4th Cir. 1984), *citing Radobenko v. Automated Equip. Co.*, 520 F.2d 540, 544 (9th Cir. 1975).

16

conclusory affidavits do not establish an issue of fact for purposes of opposing a motion for summary judgment.[42]

Analysis

In oral argument, CBNA claimed that its entitlement to summary judgment establishing liability coverage was "rock solid." It is not. The evidence simply cannot be stretched to this extent.

The first ten pages of CBNA's opening brief are dedicated to establishing the existence of a CIC policy of some sort designated SMP 2390621.[43] CIC does not contest this point.[44] CIC denies, however, that it issued any other policy to CBNA and also denies that CBNA has proven as a matter of undisputed fact and law the *terms and conditions* of policy SMP 2390621, particularly with regard to liability coverage.

CBNA's summary judgment memorandum devotes only five pages of cursory argument to the keystone of its lawsuit: the demonstration, by inference, of the existence and terms of liability coverage extended by CIC in the 1970's.[45] CBNA's hypothesis for liability coverage is built primarily on selected bits of testimony from Juanita Brown, a retired former LaBow Haynes insurance broker for the Diocese, and George Bowder, the financial officer for the Fairbanks Diocese, plus various isolated documents from the 1970's, presumably from the records or archives of CIC, LaBow Haynes, and the Diocese. CBNA builds its case

---

[42] *Jackson v. Anchor Packing Co.,* 994 F.2d 1295, 1304 (8th Cir. 1993).

[43] CBNA's Mem. in Supp. (Docket No. 48), 4-9.

[44] *See* CIC's Mem. in Supp. (Docket No. 46), 4.

[45] CBNA's Mem. in Supp. (Docket No. 48), 10-15.

for insurance on the argument that its missing policies were identical to those issued to provide coverage to its sister diocese in Anchorage during the same time frame.

Two insurance policies from CIC, providing coverage for the Archdiocese of Anchorage, have been found. The first policy, SMP 8288602, was located by CNA (CIC's successor) in August, 2004, and transmitted to James M. Gorski, one of CBNA's counsel.[46] This first policy, a 56 page document, was a new CIC policy which was effective from April 15, 1972, through April 15, 1975.[47] The three-year provisional premium for the policy was $139,683.00.[48] The second policy, SMP 2397994, was a renewal of the first. It consisted of 100 pages and covered the period from April 15, 1975, through April 15, 1978.[49] The three-year provisional premium on this policy was $91,965.00.[50] Although CBNA argues that its liability coverage mirrored the coverage provided in these two policies, it does not explain the one-year discrepancy in coverage periods: CBNA contends it had liability insurance coverage from CIC from October 14, 1973, to April 15, 1979,[51] while the CIC policies issued to its sister diocese in Anchorage covered the time frame of April 15, 1972, through April 15, 1978.

The latter policy for the Archdiocese of Anchorage contains a Named Insured Endorsement which lists four entities: (1) Corporation of the Catholic Archbishop of

---

[46] *See* Robb Dep. 80:19-81:5 and Ex. 4, appended to CBNA's Mot. for Summ. J. (Docket No. 47).

[47] *See* CBNA's Mot. for Summ. J. (Docket No. 47), Ex. D and Brown Dep. 22:20-24:22.

[48] *Id.*, Ex. D at 6.

[49] *See* CBNA's Mot. for Summ. J. (Docket No. 47), Ex. E.

[50] *Id.*, Ex. E at 1.

[51] *See* CBNA's Mot. for Summ. J. (Docket No. 47), at 1.

Anchorage, (2) Catholic Archdiocese of Anchorage, (3) Alaska Catholic Conference, Inc., and (4) Catholic Charities.[52]  Notably, neither the diocese based in Juneau or Fairbanks (CBNA) is included as a named insured.[53]  For some reason, the earlier, 1973 to 1975 policy which had been issued to the Archdiocese of Anchorage does not contain a similar list of named insured entities.

The 1972 to 1975 policy issued to the Archdiocese of Anchorage provided the following liability coverage:

| | |
|---|---|
| Bodily Injury Liability: | $100,000 each person |
| | $300,000 each occurrence |
| | $300,000 aggregate |
| | |
| Property Damage Liability: | $50,000 each occurrence |
| | $50,000 aggregate[54] |

<u>The Deposition Testimony</u>

CBNA relies largely upon the deposition testimony of Juanita Brown to support its claim that it had liability coverage comparable to the Anchorage Diocese from 1973 to 1979.[55]  Ms. Brown was a retired LaBow Haynes broker, who gamely tried to recall transactions which had occurred over 30 years ago.  LaBow Haynes served as CBNA's insurance broker during the 1970's.  Below, I have summarized CBNA's excerpts from Ms.

---

[52] *See* CBNA's Mot. for Summ. J. (Docket No. 47), Ex. E. at 2.

[53] As discussed in more detail below, CBNA argues that the Dioceses in Anchorage, Juneau and Fairbanks coordinated their insurance needs under the same account and had the same types of coverage during the 1970's.

[54] *See* CBNA's Mot. for Summ. J. (Docket No. 47), Ex. D at 44.

[55] CBNA's Mem. in Supp. (Docket No. 48), 10-14.

19

Brown's deposition and, under each excerpt, I have indicated why there is a genuine issue of fact which precludes acceptance of the testimony as being dispositive:

    (a)    In the 1970's to 1975, CBNA would have had no reason to obtain different liability coverage, through the LaBow Haynes brokerage, than the coverage obtained by the Anchorage Diocese.   The three dioceses (Anchorage, Fairbanks, and Juneau) operated under a common account called "Tri-Di." The coverage started with Anchorage and the other dioceses followed suit.[56]

        RESPONSE:  The "Tri-Di" format did not begin until 1983.[57]  This creates a question of fact as to whether Ms. Brown is mistaken about when and to what extent the coordinated treatment of the three dioceses actually began – in the 1970's, or in 1983.

        Further, Ms. Brown's own testimony raises questions about the conclusions urged by CBNA.  She testified later in her deposition that she did not know what actual coverage might have been provided by CIC to CBNA because the insurance forms could have been different. She also testified that she could not know whether the CBNA policy numbered "SMP 2390621" had liability coverage, because "[y]ou can't say what's in the policy if you can't see the policy."[58]

    (b)    Ms. Brown testified that CBNA followed the other diocese regarding property and liability limits.[59]

        RESPONSE:  Ms. Brown indicated in her testimony, and CBNA argues, that there were similar or identical policies, or a coordination of coverage, between the Anchorage, Fairbanks and Juneau Dioceses.

---

[56] CBNA's Mem. in Supp. (Docket No. 48), 10-11; Brown Dep. 14:1-5 and 32:23-33:19, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

[57] Bowder Dep. 26:22-27:6, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).  Bowder has been the Director of Finance for CBNA since 1978 and helped with monitoring or procuring its insurance (Bowder Dep. 5:2-5; 9:15; 11:20-12:3).

[58] Brown Dep. 70:7-18, 64:9-23, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47); CIC's Resp. to CBNA's Mot. for Summ. J. (Docket No. 55), 6-7.

[59] CBNA's Mem. in Supp. (Docket No. 48), at 11; Brown Dep. 37:18-38:3, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

However, there is no evidence of this between the Anchorage and Juneau Dioceses. If the similarity or coordination of policies with the Juneau Diocese is not shown, or is refuted, the alleged coordination of policies between the Fairbanks and Anchorage Dioceses is also called into question. In a February 20, 1975, Inter-Office Communication to Evelyn Christopher, CIC's underwriter in Alaska, from Paul Krug, a Seattle Superintendent for CIC involved in underwriting, he wrote:

> He [Jim McKeown, the LaBow Haynes broker who handled the Dioceses' accounts] advises that he will require three policies, one for Anchorage which includes the Liability of Juneau, one policy for Juneau, section 1 only [i.e., property coverage only], and one policy for Fairbanks coverage.[60]

Further, if there was a coordinated plan, the Juneau Diocese should have been covered in the second CIC policy issued to the Archdiocese of Anchorage, beginning in April 15, 1975 (SMP 2397994). Yet, the Juneau Diocese *does not* appear as a named insured in this renewal policy. This discrepancy raises a factual issue as to whether the coordination between the three Dioceses existed to the extent alluded to at times by Ms. Brown in her deposition.

(c)   Ms. Brown testified that CBNA would have the same ISO (Insurance Services Offices) forms for defense under Section II (liability coverage) as the Anchorage Diocese did.[61]

> RESPONSE: Julian Robb, CIC's underwriter from Seattle, who had some passing contact with LaBow Haynes regarding the Dioceses' insurance in the 1970's, testified that an SMP (Special Multi-Peril Policy) for CIC was not a static form, but was structured for the specific risks being insured. He also stated that not every SMP policy covered liability.[62] So, saying the same ISO forms would have been used for the three Dioceses is a nonsequiter when considering whether

---

[60] CBNA's Mot. for Summ. J. (Docket No. 47), Ex. C.

[61] CBNA's Mem. in Supp. (Docket No. 48), at 11, *referencing* Brown Dep. 50:1-13 (appended to CBNA's Mot. for Summ J., Docket No. 47).

[62] Robb Dep. 98:20-100:17, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

there was liability coverage in the first place. Nor can it be concluded, from the fact that SMP 2390621 existed and covered the Fairbanks Diocese, that this policy provided liability coverage. None of the terms or conditions of this policy can be determined from this information.

(d)   Ms. Brown testified that she dealt with CIC's Alaskan underwriter, Evelyn Christopher, with whom she discussed coverage issues and recalled placing general liability coverage for CBNA.[63]

RESPONSE:  Ms. Brown did not become a broker at LaBow Haynes until her boss, Jim McKeown, died of a heart attack, probably about a year after the second Anchorage diocese policy (renewed as SMP 2397994) was issued on April 15, 1975. McKeown signed the second policy, upon its renewal, as a broker. Before Ms. Brown became a broker, she characterized herself as a clerk or providing secretarial help for McKeown. Some later endorsements on this second policy indicate she had become a broker by at least October of 1976, after McKeown's death (apparently for a successor of LaBow Haynes, Rollins, Burdick, Hunter of Alaska).[64]

There is a question of fact regarding whether Brown acted as broker for CBNA, with Evelyn Christopher as underwriter for CIC, *during the relevant times*. That is, CBNA seeks to establish coverage with CIC from October 14, 1973, almost three years before Ms. Brown started acting as a broker. Ms. Brown's recollections about placing liability coverage for the Fairbanks Diocese cannot reliably be tied to this earlier period. Instead, there is a strong inference that any policies during this period would have been brokered by McKeown, not Ms. Brown.

(e)   Ms. Brown testified that the Anchorage Diocese's liability coverage was described in an endorsement, MLB 21, to the 1972-1975 policy SMP 8288602.[65] She stated that she was sure the Fairbanks Diocese had been added to this policy and that the one policy covered Anchorage, Juneau and

---

[63] Brown Dep. 16:3-19, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

[64] Brown Dep. 19:20-20:11; 12:14-13:1; 29:4-7, and Ex. E (Policy No. SMP 2397994 for the Anchorage Diocese), at 1 (McKeown signature), 67 (Brown signature), *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

[65] Brown Dep. 23:11-25:1, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

Fairbanks.[66] She further testified that the Fairbanks Diocese would be covered under this policy by an "*et al*" reference, even though it was not specifically named in the policy as an insured.[67]

> RESPONSE:  The best evidence rule bars Ms. Brown's testimony about the Fairbanks Diocese being a named insured under the Anchorage Diocese's policies.  Copies of the two policies for the Anchorage Diocese, covering the period from 1973 to 1978, have been located. Neither the Fairbanks Diocese nor CBNA or, for that matter, Juneau, are listed as named insureds in either policy.[68]  Additionally, Ms. Brown conceded, after examination of the second Anchorage policy, that CBNA was not listed on the policy prior to April 15, 1975, and that if it had been added later, it would have been by a separate written endorsement.[69]

(f)     When asked, "So if CBNA had a separate policy, do you have any reason to think the nature of that separate policy, that SMP policy would be any different than what we see for the Anchorage Diocese" other than the property descriptions being different, Ms. Brown testified, "Exactly.  The forms would be identical."[70]

> RESPONSE:  The question calls for a speculative, conclusory answer. It is put as a hypothetical, and does not reflect what Ms. Brown actually knew existed, as far as insurance coverage for the Fairbanks and Anchorage Dioceses, in the 1970's.  Ms. Brown's answer is too ephemeral to rely on.

(g)     Referring to the two Anchorage policies, SMP 8288602 for 1972-75 and SMP 2397994 for 1975-78, when Ms. Brown was asked, "Is this the sort of thing we

---

[66] *Id.* at 58:4-22.

[67] *Id.* at 59:3-7.

[68] Fed. R. Evid. 1002, 1003.

[69] Brown Dep. 59:3-60:23, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

[70] *Id.* at 70:2-7.

would be expecting to look at for the missing policy, 2390621?," she responded, "Yes."[71]

RESPONSE:  Again, the question calls for a speculative answer, and the answer is too ephemeral to rely on.

CBNA relies on the deposition testimony of George Bowder, its financial director, to make its final point, that "as to the duration of [CIC's] policy coverage, the undisputed evidence supplementing the testimony of Robb and Brown from CBNA's Finance Director . . . is that [CIC] carried CBNA's liability coverage up until a 'changeover' on April 15, 1979."[72] However, Bowder's testimony on this point is hearsay, repeating a conversation he had with the Anchorage Diocese's financial director, Frank Matulich.  Testimony supporting or opposing a motion for summary judgment "must be made on personal knowledge, and set out facts that would be admissible in evidence."[73]  The Bowder testimony on the duration of CIC's policy coverage doesn't satisfy this requirement.

As shown above, a host of genuine issues exist as to the material facts CBNA seeks to establish by way of deposition testimony in its motion for summary judgment.  The only testimony CBNA has been able to elicit to establish that CIC issued it liability insurance is found in the depositions of Juanita Brown and George Bowder.  Recapping that testimony, it is clear CBNA is not entitled to summary judgment.

---

[71] *Id.* at 73:16-21.

[72] CBNA's Mem. in Supp. (Docket No. 48), at 14-15, *referencing* Bowder Dep. 40:6-21 (*appended to* CBNA's Mot. for Summ. J. (Docket No. 47)).  CBNA doesn't pinpoint the underlying deposition testimony of Robb and Brown which Bowder is to be supplementing.

[73] Fed. R. Civ. P. 56(e), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

Bowder became financial director for the Fairbanks Diocese in 1978, shortly before the termination of the coverage CBNA seeks to establish.[74]  Bowder offered testimony of his dim recollection of conversations he had decades ago with his counterpart in the Anchorage Diocese, Frank Matulich, to the effect that CIC had been the Fairbanks Diocese's liability insurer but was phased out for all the Dioceses in 1979.  As indicated above, this is inadmissible hearsay.   And Bowder had no independent, personal knowledge of this information.  He is one of the individuals who scoured the documentary records, archives and financial accounting records of CBNA in Fairbanks.  He found no independent records or smoking gun which would verify that CIC issued liability insurance to CBNA during the 1973-79 period.

Juanita Brown's deposition testimony requires closer scrutiny.  She testified, in a conclusory manner and without specifics, that she recalled having brokered CIC liability insurance for CBNA.  But she admitted that she could not be sure any liability insurance was included in these policies or, indeed, what any of the terms would have been without actually seeing the policy.  Additionally, Brown was not a broker at LaBow Haynes until more than a year after the second putative policy, SMP 2397996, was supposed to have been issued.  Jim McKeown was the broker at LaBow Haynes who handled the insurance for the Diocese for the majority of the period that CIC allegedly issued liability insurance to CBNA.  During the period that McKeown served as broker, Brown described herself as a clerk or secretarial support staff.

---

[74] The term of the second policy which CBNA says CIC issued would have ended on April 15, 1979.

25

While the court must give CBNA the benefit of reasonable factual inferences, it should not grant summary judgment when a motion is supported by only a scintilla of evidence.[75]  Ms. Brown's conclusory statements that the Fairbanks Diocese had liability insurance, and her insistence at times that CBNA was a named or added insured on the Anchorage Diocese policies – which this court could plainly see was not true since the Anchorage policies were available – were contradicted by her testimony that she could not be sure if there was coverage.  It is reasonable to infer that CIC issued some sort of policy to CBNA within the 1970's.  However, a reasonable inference cannot be drawn from Ms. Brown's deposition that CIC issued *liability* insurance to CBNA during 1973-79.[76]

CBNA took the deposition of retired CIC underwriter Julian Robb in October of 2006.  Robb had written a letter to CBNA on February 19, 1974, regarding the storage of flammable paints.  Rev. Francis Muller responded to the letter on February 28, 1974, with a question regarding the storage of water based paints.[77]  Robb responded with a short letter on March 11, 1974.[78]  When questioned during the deposition about these letters, Robb stated that the correspondence dealt with fire or property damage issues, not general liability issues.[79]  When asked about his recollection of policies for the Archdiocese of Anchorage or the Diocese of Juneau, Robb stated he had no recollection of ever insuring or working on

---

[75] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

[76] *Bathony Transport v. Transamerica Occidental Life Ins. Co.,* 795 F. Supp. 296, 298 (D. Alaska 1992).

[77] Robb Dep. Ex. 7, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

[78] *Id.*

[79] Robb Dep. 42:14-23, 102:10-13, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

policies for any Catholic organization in Alaska.[80]  Attorneys for CBNA asked Robb if it

would be possible to reconstruct an SMP insurance policy of the type commonly seen in CIC

offices in the mid-70's.  He responded:

> Commonly seen by me? Each policy is an
> individual policy with general conditions, but can
> be anything, so you can't go out and say
> "Construct me an SMP policy" because you don't
> have any idea what coverages would have been in
> that policy.[81]

Robb provided no independent evidence which would establish the terms or

conditions of a liability insurance policy in favor of CBNA.  Instead, his testimony supports

CIC's cross-motion for summary judgment.  CBNA bears the burden of proof as to the terms

and conditions of any general liability policy issued by CIC.  CBNA cannot meet this burden

based upon the deposition testimony which has been provided.


Documentary Evidence

In addition to the deposition testimony, there were a dozen or so pieces of

documentary evidence submitted in support of the two motions for summary judgment. These

documents were dredged up by the parties from the records or archives of CBNA, CIC, and

LaBow Haynes, the broker.  CIC contends most of this documentary evidence is inadmissible

on a number of grounds.  According to CIC, the documents have not been submitted by a

witness with personal knowledge of the exhibits and how they were prepared, the exhibits

---

[80] Deposition of Julian Robb, 50:21-24.

[81] *Id.* at 67:2-7.

have not been properly authenticated and the exhibits violate the best evidence rule.[82]  CIC
argues that it is difficult to know where some of the evidence came from or what it means.
CBNA relies on the business record exception (and, possibly, the ancient document
exception).

CIC's objections are well taken.  CBNA has failed to lay the proper foundation
necessary for the admission of these documents.  Even if all of the exhibits were to be
considered as evidence, however, they fail to constitute sufficient secondary evidence of the
nature, conditions or terms of a liability policy in favor of CNBA.  Below, I have listed the
principal documentary evidence, along with my analysis as to why they do not support
CBNA's case, based on secondary evidence, that it had liability insurance coverage from CIC
from 1973 to 1979:

### A)  11/06/73 CIC Telex from Evelyn Christopher to Julian Robb

A telex dated November 6, 1973, was sent to Julian Robb in Seattle from
Evelyn Christopher in Anchorage.[83]  It states:

> Did you approve SMP Catholic Bishop Northern
> Alaska for LaBow Haynes?  They are asking me
> to issue policy here.  They want dates to concur
> with other SMP for the Anchorage Locations so
> first year to run 10-14-73 to 4-15-74.  Please telex
> reply as I am to be in their office tomorrow to set
> up policy.[84]

---

[82] Fed. R. Evid. 602, 901 and 1002.

[83] CIC's Mem. in Supp. (Docket No. 46), Ex. D.

[84] *Id.*

28

No reply to the document has been found or produced.  The telex is consistent with CIC's admission that a policy was issued.  It does not, however, provide any evidence as to the nature, terms or conditions of such a policy.

### B)  11/7/73 Letter to Rev. Mueller from Bishop Whelan

On November 7, 1973, Bishop Whelan, who was then serving as the bishop for the Fairbanks Diocese, wrote to Rev. Mueller at St. Patrick Church in Barrow, Alaska, telling him of a "blanket insurance policy with LaBow Haynes of Alaska, Inc."[85]  In the letter, Whelan advised Mueller to return any policies his parish had with Catholic Mutual of Omaha to the insurer because that policy had been terminated and a new policy with LaBow Haynes issued on October 14, 1973.  Although Whelan's letter advised that the new coverage was "equal or better than that which we had previously," it gave no further specifics.[86]  This letter is consistent with the telex.  It does not provide any evidence as to the nature, terms and conditions of the new policy.

### C)  02/20/75 CIC Inter-Office Communication

On February 20, 1975, Paul King of CIC sent an "inter-office communication" to Evelyn Christopher.[87]  The communication discusses issuing three policies, "one for Anchorage which includes the Liability of Juneau, one policy for Juneau, section 1 only and

---

[85]  Bowder Dep. Ex. 4, *appended to* CBNA's Notice of Compliance with Court's Request to Supplement the Record, filed Aug. 28, 2009 (Docket No. 97).

[86]  *Id.*

[87]  CIC's Mem. in Supp. (Docket No. 46), Ex. M.

one policy for the Fairbanks coverage."[88]  Handwriting at the top of the page states, "SMP for Archdiocese Catholic Bishop (not Northern Alaska Bishop)."[89]  A handwritten response at the bottom of the page, signed by "Evelyn," says "the policies will be SMP 239 7994; 95 & 96."[90]

This note supports an inference that a policy was written to CBNA, a point which CIC concedes.  However, as with the above documentation, the note provides no evidence as to the nature, terms or conditions of such insurance.  Further, the handwriting at the top of the page seems to indicate that "SMP" coverage was intended only for the Anchorage Diocese.

### D)  02-06-75 Telephone Request

A "telephone request" slip dated February 6, 1975, provides a record of a phone message from "Jim McKeon."[91]  The document states: "Renewal 4-15 Fairsbank [sic] Catholic Bishop of Northern Alaska."[92]  The exhibit references two policy numbers in the upper right hand corner: SMP 2390621 and SMP 8288602.  The document does not indicate

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] CIC's Mem. in Supp. (Docket No. 46), Ex. L.

[92] *Id.*

a renewal was ever issued, however.  Nor does it contain any information regarding the

nature, terms or conditions of any policy issued in favor of CBNA by CIC.


### E)  Undated LaBow Haynes Phone Message

      This memorandum was created on LaBow Haynes letterhead.[93]  The "to, from,

date and reference" blocks at the top of the page are blank.  The "message" portion of the

document, which is typewritten, reads::

> Attached are insurance requirements for the
> named entities.  The liability insurance for Juneau
> is to be put on the Anchorage liability policy and
> the underwriting data is included in the
> Anchorage schedule.   We would appreciate
> alternate specifications for building special form.
> Fairbanks is to be quoted as per attachment.[94]

The referenced attachment is not provided.  Unidentified handwriting in the "reply" portion

of the memorandum lists three SMPS:  "1)  SMP Fairbanks Incl Liability (2) SMP

Anchorage Incl Juneau liability (3) SMP Juneau Sect.#1 only."[95]  "Juneau" is written at the

top of the memorandum as well, in what appears to be the same handwriting."

      This document indicates that the Fairbanks policy may have included liability

insurance.  But the attachments to the document, which would have included "the insurance

requirements" for a Fairbanks policy, are not included.  Nor is there anything in the document

---

[93] CIC's Mem. in Supp. (Docket No. 46), Ex. N.

[94] *Id.*

[95] *Id.*

itself that indicates the scope, terms and conditions of the Fairbanks policy. Also, notably, neither of the Anchorage Archdiocese policies which have been located (SMP 8288602 and SMP 2397994, spanning April 15, 1972 through April 15, 1978) show that the Juneau Diocese was a named insured on the two policies. This also is contra to the information found on the phone message, which references "SMP Anchorage Incl Juneau Liability." This further calls into question whether a CBNA policy was ever issued consistent with the notations on the phone message.

### F) CIC Accounting Ledgers (compilation)

CBNA alleges that certain accounting records establish that it had a liability policy with CIC. Computer print-outs from CIC indicate that CBNA was an "assured" along with other entities, during the 1970's.[96] On the first page of this documentation, which is dated "as of 4/30/74," two policy numbers are listed for CBNA: L4420683 and L6376707.[97] Robb testified that the "L" prefix indicated a general liability policy, although what "forms" were on that policy could not be determined from this prefix.[98] No one knows the significance of the policy numbers themselves. Gross premiums for the two listings on this page are $87.00 and $23.00. On the second page of the accounting records, dated "as of

---

[96] CBNA's Mot. for Summ. J. (Docket No. 47), Ex. B.

[97] *Id.* at 1.

[98] Robb. Dep. 27:7-10, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

5/31/74," CBNA is listed as an assured five times with a policy number of L4420683.[99]

CBNA has not argued in its motion for summary judgment that Policy L4220683 provided

CIC liability coverage for the defense against and indemnity for the sexual abuse claims. The

effective dates listed for the CBNA entries on this page vary from 11/73 to 04 and 05 of 74.

Premiums for the insurance totaled $360.00. Another page of the accounting records, dated

"as of 3/31/74," lists CBNA twice with Policy No. SMP 2390621 and three times with Policy

No. L4420683.[100] Finally, a "premium register" for April, 1974, lists CBNA as insured in

six entries, all referencing the policy SMP 2390621.[101] The dates for the policy cover the

period from 04/73 to 04/74 and from 04/74 to 04/75.[102] The premiums listed total

$13,948.00, and two credits totaling $425.00 are also listed.[103]

      These records establish that a policy was issued. This is a point conceded by

CIC. However, although the records infer that a liability policy had been issued, and that

premiums had been invoiced to or paid by CBNA in 1974, there is nothing in these

accounting records which provides guidance as to the nature, terms or conditions of the

referenced policy.

---

[99] CBNA's Mot. for Summ. J. (Docket No. 47), Ex. B at 2.

[100] *Id.* at 4.

[101] *Id.* at 3.

[102] *Id.*

[103] *Id.*

33

### G)  First CIC Policy for the Anchorage Diocese (SMP 8288602)

CBNA has provided a copy of insurance policy SMP 8288602 issued to the Archdiocese of Anchorage for the period from April 15, 1972 through April 15, 1975.[104] This policy contained a comprehensive general liability endorsement and a personal injury endorsement.[105]  No one is listed as a named insured on the policy, although both parties seem to concede that it covered Anchorage.  The premium for the policy was nearly $140,000.00, to be paid in three annual installments of $46,561.00.[106]

CBNA was not listed as an insured on this policy.  Nor is there a sufficient basis in the record to conclude that this policy was identical to the one issued to CBNA.  The Tri-Di policies were not issued until 1983.  Further, there is a substantial disparity between the three annual premium payments required to maintain this policy and the premium amounts listed on the CIC accounting records discussed above.

### H)  Second CIC Policy for the Anchorage Diocese (SMP 2397994)

CBNA has also provided a copy of insurance policy SMP 2397994 issued to the Archdiocese of Anchorage for the period from April 15, 1975 through April 15, 1978.[107] As previously noted, this policy listed a number of insured parties: the Corporation of the

---

[104] CBNA's Mot. for Summ. J. (Docket No. 47), Ex. D.

[105] *Id.* at 44.

[106] *Id.* at 6.

[107] CBNA's Mot. for Summ. J. (Docket No. 47), Ex. E.

Catholic Archbishop of Anchorage, the Catholic Archdiocese of Anchorage, the Alaska Catholic Conference, Inc., and Catholic Charities.[108] CBNA was not a named insured under the policy.

Juanita Brown testified that the Anchorage, Fairbanks and Juneau Dioceses operated under a common account for insurance, called the "Tri-Di" account. However, George Bowder stated that the Tri-Di insurance arrangement did not begin until 1983. Further, CBNA has provided no accounting records from this second time period to establish that it paid a premium to CIC for insurance coverage. As with the first policy, there is insufficient evidence to support a finding that this policy covered CBNA, or that CBNA had a policy from CIC that mirrored the coverage extended to the Anchorage Diocese during this time period.

### I) 08/24/04 Letter from CNA to James M. Gorski Re Finding Anchorage Policies

A short letter of enclosure was sent from CNA, as successor to CIC, to the attorney for the Anchorage Archdiocese, with a copy of Policy SMP 8288602.[109] While this letter verifies that a copy of the policy was found in CNA's records, nothing contained in the letter indicates that CBNA had similar policies or coverages.

---

[108] *Id.* at 1, 2.

[109] Robb Dep. Ex. 4, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

### J)  02/18/74 Letter from Fr. Mueller to Julian Robb, and Robb's Response

Father Mueller, then Chancellor of the Diocese of Fairbanks, wrote a letter to Julian Robb at CIC on February 18, 1974.[110]  This letter indicates that CBNA will co-operate with CIC regarding the storage of flammable paints.  Robb sent a short letter in response on March 11, 1974.[111]  Nothing in this exchange of correspondence indicates that CBNA had liability coverage on its policy.

### L)  Undated Letter (circa 04/22/76) from The Kohler Agency to Bishop Whelan

This two-page correspondence from insurance salesman John P. Kohler thanks Bishop Whelan for giving him the opportunity to procure insurance quotes for CBNA.[112]  There is some handwriting on the bottom of the page indicating that Father Mueller met with John Kohler on April 1, 1976.[113]  The second page of the correspondence lists proposed amounts for property coverage, vehicles and aircraft.  It indicates that Kohler was seeking a quote for general liability and $2 million in excess liability and boiler coverage but hadn't obtained one yet.  The liability coverage was to be provided by Industrial Indemnity Insurance Company, but its quote was not available at the time Kohler wrote the letter.[114]

---

[110] *Id.* Ex. 7, p. 1 (labeled "CBNA.INS.345" in lower right corner).

[111] Id. Ex. 7, p. 2 (labeled "CBNA.INS.347" in lower right corner).

[112] Robb Dep. Ex. 10, *appended to* CBNA's Mot. for Summ. J. (Docket No. 47).

[113] *Id.*

[114] *Id.*

36

Mueller and CBNA decided not to switch to the Kohler Agency for the Diocese's insurance needs. Further, the quotes listed on the second page of the letter, which reference liability insurance, do not aid CBNA's case. The listed cost of coverage for property, vehicles and aircraft alone substantially exceeds the premiums of roughly $14,000 which CBNA paid to CIC in 1974. Given this quote, it's reasonable to conclude that CBNA did not purchase liability insurance from CIC. Moreover, the fact that CBNA sought quotes for liability insurance from Kohler at some unknown date in 1976 does not provide a basis for determining the scope, nature or terms of any liability coverage that was in force during the period of 1973 through 1979.

Conclusion

The evidence presented in the cross-motions for summary judgment establish that CIC issued a policy of insurance to CBNA in the early 1970's. CIC admits this point. However, having thoroughly culled through the depositions and documentary evidence which has been submitted, I conclude it is insufficient to establish that CIC extended liability coverage to CBNA during the time frame from 1973 through 1976. The deposition testimony was inconclusive and contradictory on this point. And while the documentary evidence establishes that CBNA and CIC communicated about various insurance issues during the 1970's, none of the documents contained information specific to liability insurance. Finally, although certain accounting records established that CBNA had paid

37

premiums of roughly $14,000.00 to CIC in 1974, the single year of premium payments cannot establish the type of coverage provided. Nor can liability insurance be inferred from the amount of the payments shown on the accounting records. These payments were significantly less than the premium amount for the Anchorage Archdiocese's 1972 - 75 policy, and even less than the amount quoted by another insurance broker in 1976 for just property, vehicle and aircraft coverage alone.

Referring back to standards from the *Dart* case, CBNA has failed to satisfy the final two elements required to establish the lost policies. The verbatim terms of the policies did not need to be established, but CBNA was required to establish their scope or relevant substance through its secondary evidence.[115] The secondary evidence presented here does not meet this standard. Further, CBNA has insufficient evidence to carry its burden of persuasion at trial.

CBNA's motion for summary judgment will be denied. CIC's cross motion for summary judgment, which seeks a declaration that it does not owe CBNA a duty of defense or indemnity for the sexual abuse claims related to the October 14, 1973 to April 15, 1979, time period, will be granted. An order will be entered consistent with this memorandum. It will be an interlocutory order because the amount of CIC's prepetition claim still needs to be liquidated. Additionally, CIC is entitled to attorney's fees and costs.[116]

---

[115] *Dart*, 52 P.3d 87-89.

[116] *In the Matter of Holiday Mobile Home Resorts,* 803 F. 2d 977, 979 (9th Cir. 1986).

38

A final judgment will be entered after CIC's prepetition claim has been liquidated and its

fees and costs determined.

DATED: September  11, 2009.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  P. Nash, Esq.
        P. Stahl, Esq.
        R. Groseclose, Esq.
        D. Paige, Esq.
        K. Nye, Esq.
        J. Altieri, Esq.
        W. Corbett, Esq.
        R. Dykstra, Esq.
        P. Sievers, Esq.
        C. Ekberg, Esq.
        G. Zipkin, Esq.
        L. McNally, Esq.
        S. Boswell, Esq.
        Z. Wilson, Esq.

        09/11/09